*933 Opinion for the court filed by Circuit Judge BRYSON.
Dissenting opinion filed by Circuit Judge REYNA.
BRYSON, Circuit Judge.
I
In 2005, the United States Coast Guard issued a solicitation seeking to lease an aircraft for use by the Coast Guard Commandant and the Secretary of Homeland Security. The lease term was one year, with five one-year option periods thereafter. TKC Aerospace, Inc. (“TKCA”), proposed a Bombardier Challenger 604 aircraft for the job and won the award.
A
Three provisions of the contract are at issue in this case. The first deals with the responsibility for maintaining the aircraft. The solicitation called for the submission of two proposed maintenance plans: a “full contract maintenance plan” and an “alternative support plan” that would provide for the use of personnel at the Coast Guard Air Station in Washington, D.C., to perform “contractor-specified tasks for which the contractor has provided training, manuals and special tools as applicable to perform.” The solicitation noted that “Coast Guard Air Station Washington aviation maintenance personnel routinely perform various maintenance tasks including corrosion control.” The solicitation added that “scheduled depot maintenance” would be required in addition to day-to-day maintenance of the aircraft.
TKCA’s proposal explained that “all major and most minor scheduled [maintenance] will be conducted at a Bombardier factory,” and it set out two options for day-to-day maintenance. Under the first option, the “Full Contract Maintenance Plan,” day-to-day maintenance would be performed by three TKCA maintenance personnel assigned to the Coast Guard Air Station in Washington, while the Coast Guard would still perform nonmaintenance functions such as fueling and servicing the aircraft. Under the second option, the “USCG Maintenance Capability” plan, the Coast Guard would perform the day-to-day maintenance functions, and TKCA would supply one on-site person at the Coast Guard Air Station in Washington “to monitor the USCG maintenance of the aircraft, coordinate parts deliveries, scheduled maintenance planning and coordination, etc.” The price for the full maintenance plan was $69,501.14 per month; the price of the plan with “Air Station Washington provided maintenance” was $55,126.14 per month.
The government opted for the “USCG Maintenance Capability” option, under which it would provide so-called unit-level maintenance and Bombardier, through a subcontract with TKCA, would provide depot-level maintenance. Steve Badolato was the TKCA employee charged with monitoring the Coast Guard’s maintenance on site.
The second provision at issue relates to the aircraft’s availability. It assigns TKC responsibility for meeting “performance metrics,” including an “Operational Availability (Ao)” of 95%. The contract explains that the Ao metric is “designed to maximize availability to Coast Guard Air Station Washington, while meeting the manufacturer’s FAA-approved maintenance requirements of the aircraft.” Section 5.17.5 of the contract is entitled “Computing Availability.” It states:
Semi Annual Ao = Uptime/(Uptime +Downtime)
Uptime represents the amount of time the system has been fully operational *934 based on 8760 hours per year (365 days * 24 hours/day).
Downtime represents the sum of [Not Mission Capable Time] and [Partially Mission Capable Time] in hours or fraction thereof. The Coast Guard and the Contractor have mutually agreed that downtime will be measured from the time the Contractor is notified by the Coast Guard Air Station Washington Maintenance personnel ....
Specified price reductions are laid out in section 5.17.6.1 of the contract, in the event that “the required availability rate is not met over the measured semi-annual period.”
TKCA’s proposal represented that the Challenger 604’s low maintenance requirements would “greatly reducef ]” the difficulty of meeting the 95% availability requirement. It ran through estimated calculations of scheduled and unscheduled maintenance to project a “Not Mission Capable” rate of 3.735%. That left 1.265% for partially mission capable failures, which, TKC said, “should be sufficient allowance.” Thus, TKC’s projections anticipated that all maintenance would count against the 95% Ao requirement and, in its view, “demonstrate^ the ability of the TKC ... Team to meet the minimum Availability Rate of 95%.” The contract also specified that “any downtime which is caused by the Coast Guard will not be included in computing Availability.”
The final disputed provision is the standard risk-of-loss provision taken from the Department of Homeland Security’s supplement to the Federal Acquisition Regulation, 48 C.F.R. § 3052.228-91. It provides:
(a) The Government assumes all risk of loss of or damage (except normal wear and tear) to the leased aircraft during the terms of this lease while the aircraft is in the possession of the Government. (b) In the event of damage to the aircraft, the Government, at its option, shall make the necessary repairs with its own facilities or by contract, or pay the Contractor the reasonable cost of repair of the aircraft.
B
While conducting the scheduled depot maintenance in December 2009, Bombardier discovered extensive corrosion damage beneath the carpet and around the seats inside the aircraft. During the 2008 depot maintenance, Bombardier had discovered and repaired a small amount of corrosion damage in the seat tracks. The damage discovered in 2009 was more extensive. Mr. Badolato’s initial reaction was that Bombardier should have discovered the corrosion during the 2008 depot inspection, “as [the corrosion] didn’t manifest itself over a one year period.” Mr. Badolato stated that in his view Bombardier “should cover the 250 man hours of access required as well as compensation for the progression of corrosion over the year period.” TKCA had Bombardier make the necessary repairs and did not indicate at that time that it intended to charge the Coast Guard for the repairs. The plane was returned for service on January 20, 2010.
In April 2010, TKCA received a letter from the Coast Guard stating that the aircraft was unavailable from December 19, 2009, through January 18, 2010, and that the 5% unavailability allowance in the contract was exceeded. The Coast Guard advised that it would withhold $631,414 in payments to TKCA, an amount that was later reduced to $493,988.60.
TKCA responded that the withholding violated the terms of the contract. It contended that the corrosion damage was the Coast Guard’s fault because it fell within *935 the Coast Guard’s day-to-day maintenance obligations. TKCA therefore argued that it was entitled to credit for the $493,988.60 that was assessed for downtime and should be paid an additional $135,547.58 for the cost to repair the corrosion damage. The Coast Guard refused the request.
In June 2010, TKCA submitted a certified claim in the amount of $629,536.18. When the contracting officer denied the claim, TKCA appealed to the Civilian Board of Contract Appeals.
After an evidentiary hearing, the Board denied TKCA’s appeal. The Board noted that at the time the aircraft was returned to service, “there was no indication from TKCA that the corrosion repair was anything other than depot level maintenance, which was the responsibility of TKCA.” With respect to responsibility for the corrosion, the Board found that the evidence was “inconclusive” and that “the cause of the corrosion is undetermined.” However, the Board found that the Coast Guard had not “failed to follow the maintenance procedures required by the contract, [and] that [no] lack of maintenance on the part of USCG contributed to the corrosion problem.” In the absence of a known cause of the corrosion, the Board concluded that the responsibility for repairing the damage fell on TKCA “[a]s part of Bombardier’s depot maintenance program.” The Board found that “TKC was responsible for all maintenance of the aircraft” under the contract, even if Coast Guard personnel were performing some of it. In support of that conclusion, the Board noted that TKCA had assumed responsibility for the 2009 corrosion repair until after the Coast Guard assessed it for the aircraft’s downtime during the repair period.
The Board interpreted the risk-of-loss clause in the contract to apply only to “accidental damage to the aircraft while in the possession of the USCG [and to] ha[ve] nothing to do with corrosion or contract maintenance.” The Board found that TKCA had failed to demonstrate that the damage was not caused by normal wear and tear; to the contrary, the Board noted, the wet carpet conditions that TKCA contended were responsible for the corrosion constituted the type of wear and tear that rendered the risk-of-loss clause inapplicable.
Finally, the Board rejected TKCA’s interpretation of the “operational availability” provision as requiring the Coast Guard to give notice to TKCA before assessing downtime. The notice provision, the Board held, “refers only to situations where the aircraft is ‘down’ while it is at the Coast Guard Air Station Washington, or possibly, in locations where the contractor would not know that the aircraft is down and the Coast Guard Air Station Washington would.” The provision did not apply when maintenance was being performed and TKCA knew the plane was down. The Board found that TKCA’s actions in December 2009 demonstrated that TKCA knew the plane was unavailable, that “downtime was an issue,” and that “no notice communication from the Coast Guard Air Station Washington was necessary” to start the downtime clock running.
TKCA appealed from the Board’s decision denying the claim in its entirety.
II
1. Corrosion Control.
TKCA first argues that the Coast Guard was responsible for the corrosion that was discovered during the 2009 depot maintenance and therefore was liable for the cost to repair that damage.
The contract provided that TKCA (or its agent, Bombardier) would be responsible for maintenance of the aircraft in two respects — through “depot maintenance,” *936 i.e., regular maintenance conducted at a Bombardier facility; and through day-today maintenance at the Coast Guard Air Station in Washington, the aircraft’s home base. TKCA assigned an on-site project manager to the Washington base who was responsible for “[coordinating ... all the required maintenance, special equipment, and personnel requirements for [the aircraft’s] operating locations” and “[d]irecting the maintenance of aircraft in coordination with the appropriate Service Center(s) scheduling managers.” The contract stated that TKCA would train and instruct Coast Guard employees to perform “routine and special aircraft inspections and related aviation and administrative duties.” Those duties included “corrosion control, preflight, thru flight, postflight, and other routine inspections.” Significantly, TKCA agreed that its on-site TKCA project manager would “monitor the [Coast Guard] maintenance of the aircraft” and be responsible for “scheduled maintenance planning and coordination,” while “[a]ll major and most minor scheduled maintenance would still be performed by the contractor Bombardier factory” or other TKCA-designated facilities by TKCA-designated agents.
As part of regular maintenance program, Bombardier performed “structural maintenance” of the aircraft, which included removing the carpets, seats, and other interior finishes in the aircraft to look for corrosion damage and repair it if found. It was during such a period of depot maintenance, in December 2009, that Bombardier discovered the corrosion and undertook the repair that became the subject of this lawsuit.
The Board found that there was no known cause for the corrosion and that under those circumstances, the contract placed the responsibility for repairing the corrosion on TKCA, which had the contractual obligation to look for corrosion during depot maintenance and to repair it when found. The Board concluded that the contract did not relieve TKCA of its responsibility to ensure that the aircraft was being properly maintained; it was just that Coast Guard personnel were performing some of the maintenance. The Board explained: “There is no merit to the argument that TKCA was not responsible to ensure that the aircraft was being properly maintained because the [Coast Guard] had agreed that its personnel would actually perform ‘routine’ maintenance.” TKC Aerospace, Inc. v. Dep’t of Homeland Sec., CBCA No. 2119, 2012 WL 443516, 12-1 BCA ¶ 34,937, at 171, 770. Nor was there any evidence, according to the Board, that the Coast Guard failed to perform any of the routine maintenance tasks properly: “To conclude that, after years of maintaining the contract properly as directed by TKCA, the [Coast Guard] suddenly stopped doing so and caused the corrosion problem is unsupported by the evidence.” Id.
The Board’s finding that TKCA was responsible for directing routine maintenance at the Washington base and conducting major maintenance and repair at the Bombardier facility was soundly based on the terms of the contract, TKCA’s maintenance plan, and the testimony of witnesses at the hearing before the Board. The Board found that the evidence did not establish that the Coast Guard failed to follow the maintenance procedures required by the contract or that any lack of maintenance on the part of the Coast Guard contributed to the corrosion problem. Moreover, the Board found that TKCA’s project manager, when apprised of the discovery of the corrosion damage, admitted that Bombardier had failed to discover the corrosion damage during the 2008 depot maintenance of the aircraft. Based on those findings, which are sup *937 ported by substantial evidence, the Board reasonably concluded that the Coast Guard was not ultimately responsible for failing to discover the corrosion that was found when the carpet and the seats were removed, and that the responsibility for discovering and repairing that condition rested with TKCA. The Board’s decision on the issue of the responsibility for corrosion control must therefore be upheld.

2. Notification of Aircraft Unavailability.

TKCA argues that the contract required the Coast Guard to notify TKCA that the aircraft was unavailable even when the plane was being serviced in the Bombardier depot designated by TKCA. The Board disagreed with that interpretation of the contract, and so do we.
The contract provides that the “downtime” for which TKCA is responsible “will be measured from the time the Contractor is notified by the Coast Guard Air Station Washington Maintenance personnel until” the aircraft is returned to ready-to-fly status. The Board sensibly interpreted that provision to require the Coast Guard to notify TKCA when the aircraft was unavailable in Washington or in some other location where TKCA would not necessarily be aware of its unavailability. It would make no sense to require the Coast Guard to notify TKCA that the aircraft was unavailable when the aircraft was in the possession of TKCA undergoing repairs or maintenance at a TKCA-designated facility. In any event, the Board pointed to substantial evidence that the Coast Guard did provide notification of the aircraft’s unavailability: according to TKCA’s own claim letter, the two parties “agreed that corrosion repairs should be started immediately while the aircraft was at the Bombardier maintenance facility to minimize downtime and cost for the repairs.” Nothing in the contract requires that the notification be in writing or that it specifically advert to the operational availability requirement of the contract.
TKCA characterizes the “notification” provision as if it required not just notice of the unavailability of the aircraft, but notice that the Coast Guard intended to treat the period of unavailability as chargeable to TKCA. The contract language, however, does not support that interpretation. The evident purpose of the notification provision was to apprise TKCA that the aircraft was out of service so that TKCA could take steps to minimize the aircraft’s downtime and avoid incurring a penalty under the contract. That purpose would not be served by requiring notification during a period when TKCA was fully aware that the aircraft was out of service because it was undergoing maintenance at a TKCA-designated depot.
The contract provides that the calculation of downtime excludes periods in which the downtime is caused by the Coast Guard (other than normal wear and tear), that the calculation of availability “is dependent on a wide range of variables,” and that availability “is to be computed and verified semi-annually.” Those provisions indicate that availability is to be determined retrospectively and that it will frequently not be possible to determine in advance whether a particular period of downtime due to maintenance and repair will be chargeable against the downtime allowed by the contract. For that reason, the Coast Guard would frequently not know at the beginning of a period of maintenance and repair whether the unavailability of the aircraft during that period would be chargeable to TKCA. To require the Coast Guard to notify TKCA, at the outset of any such downtime period, that the unavailability of the aircraft would be charged against TKCA would be a point *938 less formality that would not advance any purpose served by the notification requirement. It would, in effect, require the Coast Guard to “notify” TKCA of the aircraft’s unavailability at the outset of any period of maintenance simply to guard against the possibility that the period of maintenance would last longer than the permissible period under the contract and thus ultimately result in downtime chargeable to TKCA.
It is telling that in the course of the parties’ exchanges prior to the institution of this action before the Board, and in the submissions to the contracting officer, TKCA never relied on the absence of notification as a basis for avoiding liability for the aircraft’s downtime. The notification requirement, moreover, was barely mentioned in the hearing before the Board; it emerged as an issue in the case only in TKCA’s post-hearing brief. Instead, the parties focused on whether the downtime was the fault of the Coast Guard, which under the plain terms of the contract would excuse TKCA from liability for the downtime. It is thus evident from the conduct of the parties that they regarded the downtime for depot maintenance as chargeable in the calculation of aircraft’s operational availability and that they did not regard advance notification as a precondition for the Coast Guard to claim chargeable downtime for depot repairs that were not the Coast Guard’s responsibility.[1] Because the Board’s decision on this point is supported by substantial evidence, we sustain it.
3. Risk-of-Loss Clause.
TKCA argues that the risk-of-loss clause in the contract applies to the corrosion damage to the aircraft and that the Coast Guard was therefore liable for the damage that TKCA repaired. The Board, however, found that the risk-of-loss clause pertains to accidental damage to the aircraft while in the government’s possession, and that it does not pertain to repairs performed as a part of the contract-designated maintenance, such as abatement of corrosion caused by ordinary wear and tear.
We agree with the Board that the risk-of-loss clause does not excuse TKCA from its contractual obligation to repair the corrosion damage to the leased aircraft. As the Board pointed out, TKCA failed to show that the corrosion was not the product of normal wear and tear, which is specifically excluded from the risk-of-loss clause. Even the TKCA project manager originally concluded that the corrosion damage was the result of ordinary wear and tear, and that was TKCA’s position in initial correspondence with the contracting officer. Because the Board’s decision that the corrosion repair performed in this case did not fall within the scope of the risk-of-loss clause is supported by substantial evidence, we uphold the Board’s decision on that issue.
* * * * * *
TKCA makes a final, procedural argument, contending that the Board should have admitted evidence regarding similar corrosion problems encountered in another aircraft maintained by Coast Guard personnel at the Coast Guard Air Station in Washington. We have considered that issue and conclude that the Board did not *939 abuse its discretion in excluding that evidence on relevance grounds. Accordingly, we affirm the decision of the Civilian Board of Contract Appeals sustaining the denial of TKCA’s claim.
AFFIRMED

. Although no penalties had been assessed for previous periods of depot maintenance, the evidence indicated that the maintenance on those occasions had been accomplished within the scheduled period (or shortly thereafter), unlike the lengthy repair period at issue in this case. Similarly, no downtime was charged for repairs that the parties agreed were the result of damage caused by the Coast Guard, but that was because the contract expressly excluded such periods from the downtime calculation.